## SILAS MASON CO. ET AL. *v.* TAX COMMISSION OF WASHINGTON ET AL.*

No. 7. Argued April 27, 1937. Reargued October 12, 13, 1937.—Decided December 6, 1937.

* Together with No. 8, *Ryan* v. *Washington et al.*, also on appeal from the Supreme Court of Washington.

*Mr. B. H. Kizer* for appellants in No. 7, on the original argument and the reargument. *Messrs. John W. Davis, J. Arthur Leve,* and *E. D. Weller* were with him on the brief.

*Messrs. E. D. Weller* and *B. H. Kizer* for appellant in No. 8, on the original argument.

*Mr. John W. Davis* for appellant in No. 8, on the reargument. *Messrs. B. H. Kizer, J. Arthur Leve,* and *E. D. Weller* were with him on the brief.

*Messrs. E. W. Schwellenbach* and *E. P. Donnelly* for appellees in No. 8, on the original argument and the reargument.

*Solicitor General Reed,* with whom *Attorney General Cummings, Assistant Attorney General Morris,* and *Messrs. Sewall Key, J. Louis Monarch, Arnold Raum,* and *Francis A. LeSourd* were on the brief, for the United States as *amicus curiae* in Nos. 7 and 8, by special leave of Court, on the reargument.

By leave of Court, briefs of *amici curiae* were filed by *Mr. W. G. Graves,* on behalf of Mason-Walsh-Atkinson-Kier Co., in support of appellant in No. 8; and by *Messrs. E. P. Donnelly* and *E. W. Schwellenbach,* on behalf of Grant County, Oreg., in support of appellees in No. 8.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

These suits were brought to restrain the enforcement of the Occupation Tax Act of the State of Washington (Laws of 1933, c. 191, p. 869; Spec. Sess., 1933, c. 57, p. 157 [1]) as applied to the gross income received by appellants under contracts with the United States for work performed in connection with the building of the Grand Coulee Dam

[1] The Act describes the tax as laid "upon the privilege of engaging in business activities." Section 2-a (1) provides: " . . . there is hereby levied and there shall be collected from every person engaging or continuing within this state in the business of rendering or performing services . . . an annual tax or excise for the privilege of engaging in such business . . . equal to the gross income of the business multiplied by five-tenths of one per cent; . . . ."

on the Columbia River.[2] The Supreme Court of the State sustained the tax and affirmed judgments dismissing the suits. *Silas Mason Co.* v. *State Tax Comm'n,* 188 Wash. 98; 61 P. (2d) 1269; *Ryan* v. *State,* 188 Wash. 115; 61 P. (2d) 1276. The cases come here on appeal.

The questions are (1) whether the tax imposes an unconstitutional burden upon the Federal Government, and (2) whether the areas in which appellants' work is performed are within the exclusive jurisdiction of the United States. On reargument, and at the request of the Court, the views of the Government upon these questions were presented. With respect to the first question, our ruling upholding the validity of a similar tax of West Virginia as laid upon the gross receipts of a contractor engaged in building locks and dams for the United States is controlling. *James* v. *Dravo Contracting Co., ante,* p. 134. We pass to the question of territorial jurisdiction.

1. The following facts as to the nature and history of the enterprise, as set forth in appellants' complaints and shown by evidence and stipulations, are uncontroverted: The Columbia River, above its lower reaches, partakes of the character of a mountain stream, its fall being great, its current swift and its course marked at intervals of a few miles by rapids flowing over and through rocky masses of such magnitude as to render navigation difficult and in many instances impossible save by the construction of canals and locks. There are great alternations in its flow, its period of high water depending upon the melting of snow in the mountains where its sources are found. Its principal tributary is the Snake River which has the same characteristics. Through improvements that have been made and are contemplated,

---

[2] Appellant David H. Ryan, in No. 8, also brought an action to obtain a refund of occupation taxes which he had paid. That action was consolidated for hearing in the state courts with the suit for injunction to restrain further collection.

the Columbia River is commercially navigable from its mouth to the mouth of the Snake, and above that point the Columbia is navigable locally, from pool to pool, to the mouth of the Okanogan River, but all such navigation is difficult and not commercially feasible because of the physical conditions above described. These characteristics, however, "render it an ideal stream for the development of hydroelectric power." For the most part the Columbia River within the United States flows through an arid country, "the land being immensely productive and rich when placed under irrigation, but of no value without irrigation." The course of the river for the greater part of its length in the United States lies wholly within the State of Washington. From a short distance below the mouth of the Snake, the Columbia is the boundary between the States of Washington and Oregon.

Following sporadic improvements extending over a number of years, the Corps of Engineers of the War Department finally made an exhaustive survey, and in 1932 the Chief of Engineers of the United States Army recommended a comprehensive plan for the development of the Columbia River, which took into consideration the use of its waters for the purposes of navigation, flood control, power development, and irrigation. The plan contemplated the construction of ten dams across the river at various points in Washington and where the river is the boundary between Washington and Oregon. The uppermost of these dams is at the head of Grand Coulee in Washington about 150 miles below the international boundary and 274 miles above the mouth of the Snake River. The plan was commonly described as the Columbia Basin Project.

In June, 1933, Harold L. Ickes was appointed Administrator of Public Works, and later the President, under authority of the National Industrial Recovery Act (§§

201–203, 48 Stat. 200–205) directed the Administrator to include in the Public Works program the Grand Coulee Dam and Power Plant. Appellants state that the project as finally recommended by the War Department and the Department of the Interior contemplated, among other features, a dam at the Grand Coulee to be 370 feet high above low water (550 feet high, as actually constructed) and 4290 feet long on the crest, and a power plant to develop 2,100,000 horse power, at a total cost of $392,000,000. Appellants add that this is the key dam on the river and will create a lake 150 miles long, reaching the Canadian boundary; that over five million acre feet of storage will become available, the release of which when the flow of the river is at its lowest will double the prime power of the river downstream to the Snake River and add more than 50 per cent. to the power of the Columbia below the Snake; that the storage will have an appreciable effect in reducing floods on the whole river and that "there will be 905,500 acres of first class land available for irrigation."

In 1933, the legislature of the State of Washington created the Columbia Basin Commission to promote the Columbia Basin Project. Laws of 1933, c. 81, p. 376; *Ryan* v. *State, supra,* p. 1277. For that purpose the Commission obtained an allocation of $377,000 of the emergency relief funds of the State. On June 30, 1933, the United States, represented by the Commissioner of the Bureau of Reclamation, under the provisions of the Reclamation Act of June 17, 1902 (32 Stat. 388) and amendatory and supplementary Acts, made a contract with the Columbia Basin Commission by which the United States agreed to undertake topographic surveys and exploratory work and prepare certain designs and estimates for which the Columbia Basin Commission undertook to pay within the limits of its appropriation. *Ryan* v. *State, supra,* p. 1278.

On November 1, 1933, the Secretary of the Interior signed a memorandum, addressed to himself as Administrator of Public Works, in which the Secretary recommended that the project "be considered a federal project to be constructed, operated and maintained by the Bureau of Reclamation and to be paid for from net revenues derived from the sale of its electric power." Under the same date, the United States, represented by the Secretary of the Interior, in pursuance of the Reclamation Act of 1902 and the National Industrial Recovery Act, made a further agreement with the State of Washington providing for the expenditure by the United States, through the Bureau of Reclamation, of the sum of $63,000,000 for the construction of a dam and power plant at the Grand Coulee site, together with necessary transmission lines. There was further provision that the United States should retain title to the dam and power plant until the cost of the project, including the cost of the first unit dam and power plant, had been fully repaid into the United States Treasury; that the State Commission should act as an advisory board in conference with officers of the United States concerning the various important questions which might arise in connection with the construction and use of the dam, power plant and transmission lines; and that the State should have an option to purchase the perpetual right to the entire power output of the first unit dam and power plant upon prescribed conditions. *Ryan* v. *State, supra,* p. 1278.

On December 12, 1933, the Secretary of the Interior and Administrator of Public Works signed an amended Declaration of Taking in the case of *United States* v. *Continental Land Co. et al.,* in the United States District Court for the Eastern District of Washington, in which it was stated that certain lands at the Grand Coulee Dam site to the extent of 840.28 acres "are hereby taken for the use of the United States" in the construction of a

dam "for the regulation and control of the flow of the Columbia River, for a storage reservoir from the damsite to the Canadian boundary, for the improvement of navigation, for flood control, for hydro-electric power development at the Grand Coulee damsite, for the increase of power development down-stream, for the reclamation of arid and semi-arid lands, for the domestic use of water, and for the relief of unemployment." Thereupon the United States immediately acquired title and possession of the lands involved. 40 U. S. C. 258a. Shortly after, on January 4, 1934, the First Assistant Secretary of the Interior gave formal notice to the Commissioner of Public Lands of Washington of the intention of the United States to make examinations and surveys and attached to the notice a list of lands owned by the State "over and upon which the United States requires rights of way for canals, ditches, laterals and sites for reservoirs and structures appurtenant thereto; and such additional rights of way and quantities of land as may be required for the operation and maintenance of the completed works for the said proposed Columbia Basin Project." The notice was given pursuant to the state statutes to which we shall presently refer. The lands in this list are described as "Bed and Shore Lands of Washington State" and "Uplands of Washington State," affected by Columbia Basin Project.

In December 1933, the Department of the Interior entered into a contract with David H. Ryan (No. 8) for the excavation of the "over-burden" at the damsite. That work was upon land, above high water mark, already or about to be acquired by the United States. The contractor completed it in the summer of 1934, maintaining his office and living quarters within the territory of the Grand Coulee Project. The contract provided that the appellant should "obtain all required licenses and permits," should furnish "compensation insurance"

in compliance with the laws of the State, and should "comply with all applicable provisions of federal, state and municipal safety laws and building and construction codes." *Ryan* v. *State, supra,* p. 1279.

In July, 1934, a contract was made between the United States and Silas Mason Company and others, appellants in No. 7, for the construction of part of the Grand Coulee Dam and Power Plant covered by described items in the schedule of specifications, for the sum of $29,339,301.50.[3] This contract, like that of Ryan, required the contractor to obtain licenses and permits and to furnish compensation insurance in compliance with the workmen's compensation law of the State.

Such a vast undertaking necessarily had in view a large number of employees who with their families would require the appropriate facilities of community life. Accordingly, the specifications provided for the erection on the tract acquired by the Government of a "contractor's camp," embracing the various buildings incident to the work and homes for the contractor's employees. The contractor was required, regardless of the approval of the contracting officer, to "comply with all the laws and regulations of the State of Washington or any agency or subdivision thereof, which affect the building, maintenance or operation" of the camp. The discharge of sewage into the Columbia River was to conform to the laws and regulations of the Department of Health of the State. The contractor was to make all necessary arrangements with the proper state and county authorities

[3] For administrative purposes and to avoid confusion with business operations of the contractors elsewhere, the contractors organized the appellant Mason-Walsh-Atkinson-Kier Company, and to avoid objections to an assignment of the contract they entered into an agreement with the United States in September, 1934, by which the new company was constituted the agent of the contractors for the prosecution of the work without relinquishment of their obligations.

for school facilities and for police protection, which within "the area involved in and surrounding the construction work" was to be furnished by the Washington State Patrol in coöperation with the Government. The contractor was also to provide and maintain jail facilities satisfactory to the Washington State Patrol and to coöperate with it and the Government in the maintenance of law and order.

The contractor's camp has developed into a community called "Mason City." On the opposite side of the river lies another camp maintained by the United States for the offices and residences of its engineers. It appears that there are "two regularly formed school districts" in the area in question, one in the "engineers' town" and one in "Mason City," under the laws of the State of Washington; that in "Mason City" the policemen employed by the contractor have been made deputy sheriffs of Okanogan County; that the attorney for the contractor has been appointed a justice of the peace, and one of the doctors in the hospital at the camp has been made a deputy coroner, in that county; that, in the fall of 1933, one who was operating a beer parlor within the part of the area which lies in Grant County, without a permit from the county commissioners, was fined in a justice's court as provided in the local ordinance; that the sheriff of Grant County has been called to the damsite to investigate infractions of local law.

In September 1934, the Department of the Interior made a further contract with appellant Ryan for the construction of a railroad connecting with the tracks of the Northern Pacific Railway Company at Odair, Washington, and running to the site of the Grand Coulee Dam. The sole purpose of this railroad was to assist in the construction of the dam and the appurtenant works.

By the Act of August 30, 1935, 49 Stat. 1028, 1039, 1040, the Congress "validated and ratified" all the "con-

tracts and agreements" which had been executed in connection with the Grand Coulee Dam.

2. No question is presented as to the constitutional authority of Congress to provide for this enterprise or to acquire the lands necessary or appropriate for that purpose. There is no contention that the State may interfere with the conduct of the enterprise. The question of exclusive territorial jurisdiction is distinct. That question assumes the absence of any interference with the exercise of the functions of the Federal Government and is whether the United States has acquired exclusive legislative authority so as to debar the State from exercising any legislative authority, including its taxing and police power, in relation to the property and activities of individuals and corporations within the territory. The acquisition of title by the United States is not sufficient to effect that exclusion. It must appear that the State, by consent or cession, has transferred to the United States that residuum of jurisdiction which otherwise it would be free to exercise. *Surplus Trading Co.* v. *Cook,* 281 U. S. 647, 650–652; *James* v. *Dravo Contracting Co., supra.* See, also, *Fort Leavenworth R. Co.* v. *Lowe,* 114 U. S. 527, 539; *Arlington Hotel Co.* v. *Fant,* 278 U. S. 439, 451; *United States* v. *Unzeuta,* 281 U. S. 138, 142.

In this instance, the Supreme Court of Washington has held that the State has not yielded exclusive legislative authority to the Federal Government. *Ryan* v. *State, supra.* That question, however, involving the extent of the jurisdiction of the United States, is necessarily a federal question. *Brewer-Elliott Oil Co.* v. *United States,* 260 U. S. 77, 87; *United States* v. *Utah,* 283 U. S. 64, 75; *Borax Consolidated* v. *Los Angeles,* 296 U. S. 10, 22.

3. The question arises with respect (a) to lands acquired by the United States from the State itself, (b) to lands acquired by the United States from individual owners by purchase or condemnation, (c) to Indian tribal lands.

*Lands acquired from the State.* These consist of the river bed and shore lands and of certain uplands including "school lands."

While the United States has paramount authority over the river for the purpose of the control and improvement of navigation, the title to the river bed, as well as to the shore lands and school lands, was in the State (*Port of Seattle* v. *Oregon-Washington R. Co.,* 255 U. S. 56, 63) and the State had legislative authority over all this area consistent with federal functions. *United States* v. *Bevans,* 3 Wheat. 336, 386, 387; *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 Fed. 9, 18; *Hamburg American S. S. Co.* v. *Grube,* 196 U. S. 407, 415; *Gromer* v. *Standard Dredging Co.,* 224 U. S. 362, 371, 372. The notice to the state authorities by the Department of the Interior with respect to the river bed, shore lands and uplands owned by the State was said to be given "pursuant to the Act of Congress of June 17, 1902 (32 Stat. 388) and acts amendatory thereof and supplementary thereto." 43 U. S. C. 371 *et seq.* The notice is set forth in the margin.[4] The reference is to the United States Recla-

---

[4] "United States Department of the Interior
Office of the Secretary, Washington

Jan-4 1934

Bureau of Reclamation
Mails and Files, Jan 5 1934

Washington, D. C.

State Commissioner of Public Lands,
Olympia, Washington.

Dear Sir:

Please take notice that pursuant to the Act of Congress of June 17, 1902 (32 Stat. 388) and acts amendatory thereof or supplementary thereto, the United States intends to make examinations and surveys for the utilization of the waters of Columbia River and its tributaries in the development of the proposed Columbia Basin Project.

The foregoing notice is given pursuant to Section 3378 of Pierce's Code (1929).

Please take further notice that attached hereto, identified as "Exhibit A" and made a part hereof is a list of lands owned by the

mation Act. That Act was not intended to provide for the acquisition of exclusive federal jurisdiction. The Act itself stated the contrary (§ 8, 43 U. S. C. 383). It directed the Secretary of the Interior to proceed in conformity with the state laws in carrying out the provisions of the Act and provided that nothing therein contained should be construed as interfering with the laws of the State relating to the control, appropriation, use or distribution of water used in irrigation. The Act has been administered in harmony with this controlling principle that the State should not be ousted of jurisdiction. See *Kansas* v. *Colorado,* 206 U. S. 46, 92, 93; *Nebraska* v. *Wyoming,* 295 U. S. 40, 42; *California Oregon Power Co.* v. *Beaver Cement Co.,* 295 U. S. 142, 164.

The Department of the Interior expressly stated that the notice was given "pursuant to § 3378 of Pierce's Code (1929)" with respect to examinations and surveys, and the list of state lands "in pursuance of § 3380 of Pierce's Code (1929)." These are §§ 7410 and 7412 of Remington's Revised Statutes, which with related provisions were enacted in 1905. Laws of Washington, 1905, p. 180. These provisions are set forth in the margin.[5] They

---

State of Washington, over and upon which the United States requires rights of way for canals, ditches, laterals and sites for reservoirs and structures appurtenant thereto; and such additional rights of way and quantities of land as may be required for the operation and maintenance of the completed works for the said proposed Columbia Basin Project. Please file this notice, together with the attached list, in your office, as a reservation from sale or other disposition of such lands, so described, by the State of Washington.

The notice last herein given is in pursuance of Section 3380 of Pierce's Code (1929).

Very truly yours,

(Sgd.) T. A. Walters,
First Assistant Secretary."

[5] "§ 7410. *Exemptions pending federal investigation.* Whenever the secretary of the interior of the United States, or any officer of the United States duly authorized, shall notify the commissioner of

were manifestly enacted to give authority to the United States to acquire property for the purposes of irrigation under the United States Reclamation Act and with the corresponding limitations. Thus § 7410 (§ 3378 of Pierce's Code) provides for notice by the Secretary of the Interior to the Commissioner of Public Lands of the State that the United States pursuant to the Reclamation Act intends to make examinations or surveys for the utilization of specified waters. And § 7412 (§ 3380 of Pierce's Code) contemplates the proceeding under the Reclamation Act as described in § 7410.

---

public lands of this state that pursuant to the provisions of the act of congress approved June 17, 1902, entitled, 'An act appropriating the receipts from the sale and disposal of public lands in certain states and territories to the construction of irrigation works for the reclamation of arid lands,' or any amendment of said act or substitute therefor, the United States intends to make examinations or surveys for the utilization of certain specified waters, the waters so described shall not thereafter be subject to appropriation under any law of this state for a period of one year from and after the date of the receipt of such notice by such commissioner of public lands; but such notice shall not in any wise affect the appropriation of any water theretofore in good faith initiated under any law of this state, but such appropriation may be completed in accordance with the law in the same manner and to the same extent as though such notice had not been given. No adverse claim to any such waters initiated subsequent to the receipt by the commissioner of public lands of such notice shall be recognized, under the laws of this state, except as to such amount of the waters described in such notice or certificate hereinafter provided as may be formally released in writing by a duly authorized officer of the United States. If the said secretary of the interior or other duly authorized officer of the United States shall, before the expiration of said period of one year, certify in writing to the said commissioner of public lands that the project contemplated in such notice appears to be feasible and that the investigation will be made in detail, the waters specified in such notice shall not be subject to appropriation under any law of this state for the further period of three years following the date or receipt of such certificate, and such further time as the commissioner of public lands

Section 7411 (§ 3379 of Pierce's Code) refers to the same sort of proceeding. As to appropriation of water, it provides that appropriation "by or on behalf of the

---

may grant, upon application of the United States or some one of its authorized officers and notice thereof first published once in each week for four consecutive weeks in a newspaper published in the county where the works for the utilization of such waters are to be constructed, and if such works are to be in or extend into two or more counties, then for the same period in a newspaper in each of such counties: Provided, that in case such certificate shall not be filed with said commissioner of public lands within the period of one year herein limited therefor the waters specified in such notice shall, after the expiration of said period of one year, become unaffected by such notice and subject to appropriation as they would have been had such notice never been given: And provided further, that in case such certificate be filed within said one year and the United States does not authorize the construction of works for the utilization of such waters within said three years after the filing of said certificate, then the waters specified in such notice and certificate shall, after the expiration of said last named period of three years, become unaffected by such notice or certificate and subject to appropriation as they would have been had such notice never been given and such certificate never filed."

"§ 7411. *Appropriation—Title to beds and shores.* Whenever said secretary of the interior or other duly authorized officer of the United States shall cause to be let a contract for the construction of any irrigation works or any works for the storage of water for use in irrigation, or any portion or section thereof, for which the withdrawal has been effected as provided in section 7410, any authorized officer of the United States, either in the name of the United States or in such name as may be determined by the secretary of the interior, may appropriate, in behalf of the United States, so much of the unappropriated waters of the state as may be required for the project, or projects, for which water has been withdrawn or reserved under the preceding section of this act, including any and all divisions thereof, theretofore constructed, in whole or in part, by the United States or proposed to be thereafter constructed by the United States, such appropriation to be made, maintained and perfected in the same manner and to the same extent as though such appropriation had been made by a private person, corporation or association, except that

United States shall inure to the United States, and its successors in interest, in the same manner and to the same extent as though said appropriation had been made

---

the date of priority as to all rights under such appropriation in behalf of the United States shall relate back to the date of the first withdrawal or reservation of the waters so appropriated, and in case of filings on water previously withdrawn under said section 7410, no payment of fees will be required. Such appropriation by or on behalf of the United States shall inure to the United States, and its successors in interest, in the same manner and to the same extent as though said appropriation had been made by a private person, corporation or association. The title to the beds and shores of any navigable lake or stream utilized by the construction of any reservoir or other irrigation works created or constructed as a part of such appropriation hereinbefore in this section provided for, shall vest in the United States to the extent necessary for the maintenance, operation and control of such reservoir or other irrigation works."

"§ 7412. *Reservation of necessary lands by United States—Procedure.* When the notice provided for in section 7410 shall be given to the commissioner of public lands the proper officers of the United States may file with the said commissioner a list of lands (including in the term 'lands' as here used, the beds and shores of any lake, river, stream, or other waters) owned by the state, over or upon which the United States may require rights of way for canals, ditches, or laterals or sites for reservoirs and structures therefor or appurtenant thereto, or such additional rights of way and quantity of land as may be required for the operation and maintenance of the completed works for the irrigation project contemplated in such notice, and the filing of such list shall constitute a reservation from the sale or other disposal by the state of such lands so described, which reservation shall, upon the completion of such works and upon the United States by its proper officers filing with the commissioner of public lands of the state a description of such lands by metes and bounds or other definite description, ripen into a grant from the state to the United States. The state, in the disposal of lands granted from the United States to the state, shall reserve for the United States rights of way for ditches, canals, laterals, telephone and transmission lines which may be required by the United States for the construction, operation and maintenance of irrigation works."

by a private person, corporation or association." As to acquisition of title by the United States, it provides:

"The title to the beds and shores of any navigable lake or stream utilized by the construction of any reservoir or other irrigation works created or constructed as a part of such appropriation hereinbefore in this section provided for, shall vest in the United States to the extent necessary for the maintenance, operation and control of such reservoir or other irrigation works."

Neither in the statutes governing the proceeding initiated by the Secretary of the Interior nor in the state statute was there provision for acquisition by the United States of exclusive legislative authority over the lands of the State to which title was thus obtained. This is true with respect to all the lands mentioned in the Secretary's notice embracing the bed of the river, the shore lands and the designated uplands including school lands.

*Lands acquired by purchase or condemnation.* Appellants contend that exclusive jurisdiction as to these lands vested *ipso facto* in the Federal Government by the operation of Clause 17, § 8, Article I, of the Federal Constitution, which provides that the Congress shall have power "to exercise exclusive legislation" over "all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." Considering this provision in *James* v. *Dravo Contracting Co., supra,* we construed the phrase "other needful buildings" to embrace locks and dams and whatever structures are found to be necessary in the performance of the functions of the Federal Government. We also concluded that Clause 17 should not be construed as implying a stipulation that the consent of the State to purchases must be without reservations. We were unable to reconcile such an implication with the freedom of the State and its

admitted authority to refuse or qualify cessions of jurisdiction when purchases have been made without consent or property has been acquired by condemnation.

The Statute of Washington which is relied upon as granting consent and ceding exclusive jurisdiction to the Federal Government is § 8108 of Remington's Revised Statutes, the full text of which is quoted in the margin.[6] This statute gives consent to the acquisition of lands by the United States "for the sites of locks, dams, piers, breakwaters, keepers' dwellings, and other necessary structures and purposes required in the improvement of the rivers and harbors of this state, or bordering thereon, or for the sites of forts, magazines, arsenals, docks, navy-yards, naval stations, or other needful buildings authorized by any act of congress." The consent is said to be given in accordance with the constitutional provision found in Clause 17 of § 8 of Article I and with the Acts of Congress in such cases made and provided.

[6] "§ 8108. *Consent to acquisition of certain rights by United States, etc.* The consent of the state of Washington be and the same is hereby given to the acquisition by purchase or by condemnation, under the laws of this state relating to the appropriation of private property to public uses, by the United States of America, or under the authority of the same, of any tract, piece, or parcel of land, from any individual or individuals, bodies politic or corporate, within the boundaries or limits of this state, for the sites of locks, dams, piers, breakwaters, keepers' dwellings, and other necessary structures and purposes required in the improvement of the rivers and harbors of this state, or bordering thereon, or for the sites of forts, magazines, arsenals, docks, navy-yards, naval stations, or other needful buildings authorized by any act of congress, and all deeds, conveyances of title papers for the same shall be recorded as in other cases, upon the land records of the county in which the land so acquired may lie; and in like manner may be recorded a sufficient description by metes and bounds, courses and distances, of any tract or tracts, legal divisions or subdivisions of any public land belonging to the United States, which may be set apart by the general government for any or either of the purposes before mentioned by an order,

The statute in terms refers to such acquisition "from any individual or individuals, bodies politic or corporate, within the boundaries or limits of this state." This language is not apt to describe acquisitions from the State itself. And many years ago (1903) the Supreme Court of the State so held with respect to the corresponding provisions of the Acts of 1890, p. 459, and 1891, p. 31, embodied in § 8108. *State ex rel. Bussell* v. *Callvert,* 33 Wash. 380, 388–390; 74 Pac. 573. Under that construction, the above quoted provisions of § 8108 would be inapplicable to the acquisition of title to the river bed, shore lands and uplands owned by the State, apart from our conclusions in the light of the proceedings taken under the United States Reclamation Act and the pertinent state statute.

With respect to lands acquired from private owners, the Supreme Court of the State has held in the instant case that the enterprise of the Federal Government has a reach which takes it outside the purview of § 8108. The pith of the decision is that while the statute contemplated the building of locks and dams and other struc-

---

patent, or other official document or papers describing such lands; the consent herein and hereby given being in accordance with the seventeenth clause of the eighth section of the first article of the Constitution of the United States, and with the acts of congress in such cases made and provided; and the jurisdiction of this state is hereby ceded to the United States of America over all such land or lands as may have been or may be hereafter acquired by purchase or by condemnation, or set apart by the general government for any or either of the purposes before mentioned: Provided, that this state shall retain a concurrent jurisdiction with the United States in and over all tracts so acquired or set apart as aforesaid, so far as that all civil and criminal process that may issue under the authority of this state against any person or persons charged with crimes committed, or for any cause of action or suit accruing without the bounds of any such tract, may be executed therein, in the same manner and with like effect as though this assent and cession had not been granted."

tures required in the improvement of the rivers and harbors of the State, it did not contemplate the yielding by the State of all legislative authority in connection with such a project as the Columbia Basin Project embracing "the development of irrigation and of power for industrial purposes." The state court concluded "that the purposes of the project, taken as a whole, do not fall exclusively within any of the enumerated classes mentioned above [in the statute], so as to give the United States exclusive jurisdiction over the lands, but rather in a class where several purposes are so intermingled as to call for the exercise of jurisdiction by both the federal government and the state, according as their respective interests and duties require." *Ryan* v. *State, supra,* p. 1284.

Considering the scope of the federal undertaking, we cannot say that this construction of § 8108 is inadmissible. Thus irrigation—"the reclamation of arid and semi-arid lands"—is an integral part of the federal plan and the reservoirs for the storage of water were to be provided with that end in view. That was set forth as one of the main objectives, as well as the development of power, in the Declaration of Taking filed in the federal court in the condemnation proceedings, and whatever may be said of power development so far as it is incidental to the improvement of navigation, the reclamation of arid or semi-arid lands has always been regarded as a project which carried with it an appropriate recognition of a continued state jurisdiction. *Kansas* v. *Colorado, supra; Nebraska* v. *Wyoming, supra.* We cannot say that the state statute, enacted in 1891, must be taken as conclusively showing an intent to yield exclusive jurisdiction in such a case. Assuming that because of the presence of the federal question we are at liberty to construe the statute for ourselves, we should, in harmony with our principles of decision in such cases, give great weight to the views of

the state court as to the intent and limitations of the state statute in granting consent and cession. See *Freeport Water Co.* v. *Freeport,* 180 U. S. 587, 595, 596; *Milwaukee Electric Ry. & L. Co.* v. *Railroad Commission,* 238 U. S. 174, 184; *Phelps* v. *Board of Education,* 300 U. S. 319, 322; *Dodge* v. *Board of Education, ante,* p. 74. We should accept that construction unless we are satisfied that it does violence to federal right based upon the statute, defeating the reasonable anticipation and purpose of securing through the operation of the statute an essential and exclusive legislative authority for the Federal Government.

Not only do we find no violence done to federal right or frustration of federal intent by the State's construction of its statute, but the evidence is clear that the Federal Government contemplated the continued existence of state jurisdiction consistent with federal functions and invited the coöperation of the State in providing an appropriate exercise of local authority over the territory.

Even if it were assumed that the state statute should be construed to apply to the federal acquisitions here involved, we should still be met by the contention of the Government that it was not compelled to accept, and has not accepted, a transfer of exclusive jurisdiction. As such a transfer rests upon a grant by the State, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined. Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests. The mere fact that the Government needs title to property within the boundaries of a State, which may be acquired irrespective of the consent of the State (*Kohl* v. *United States,* 91 U. S. 367, 371, 372), does not necessitate the assumption by the

Government of the burdens incident to an exclusive jurisdiction. We have frequently said that our system of government is a practical adjustment by which the national authority may be maintained in its full scope without unnecessary loss of local efficiency. In acquiring property, the federal function in view may be performed without disturbing the local administration in matters which may still appropriately pertain to state authority. In our opinion in *James* v. *Dravo Contracting Co., supra,* we observed that the possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired. And we added that there appeared to be no reason why the United States should be compelled to accept exclusive jurisdiction or the State be compelled to grant it in giving its consent to purchases.

The federal intent in this instance is clearly shown. It is shown not merely by the action of administrative officials, but by the deliberate and ratifying action of Congress, which gives the force of law to the prior official action even if unauthorized when taken. *Swayne & Hoyt* v. *United States,* 300 U. S. 297, 301, 302. As Congress validated and ratified "all contracts" which have been executed in connection with the Grand Coulee Dam project, we are at liberty to refer to the terms of these contracts as manifesting the intention of Congress no less than that of the officers who executed them. These contracts with appellants were made in full appreciation of the inevitable creation, through the carrying out of this project, of a large local community within the area acquired by the United States, with residents whose needs could be suitably served by the administration of the laws of the State without interfering in any way with the execution of the

federal plan. School facilities were to be, and have been, provided by arrangements with the local authorities. Police protection was to be, and has been, assured by coöperation with the State Patrol. Cognizance of crimes committed within the area has been taken by local prosecutors and judicial officers. It is futile to say that these local authorities became federal authorities *pro hac vice,* for the contracts which have been ratified by Congress manifestly contemplated action by the local officers as representatives of the State and as acting in the exercise of state jurisdiction.

In particular, appellants' contracts assumed that state jurisdiction would extend to activities of the contractors. They were to obtain all required licenses and permits. Compensation insurance under the laws of the State was to be provided for their employees. State building regulations were to be obeyed. The rules of the local Department of Health were to be observed in the discharge of sewage into the river. We are at a loss to understand how the continued jurisdiction of the State without conflicting with federal operations could have been more fully recognized, or the assumption of exclusive legislative authority by the United States more effectively disclaimed, than by the action of Congress in ratifying the provisions of these contracts.

Appellants' argument comes to this—that we must not only override the construction of the state statute by the state court but that we must construe the statute as compelling the Federal Government to assume an exclusive legislative authority which it did not need, which it has not accepted or exercised, and against the burden of which it has sought to protect itself by securing state coöperation in accordance with the express authorization of Congress. We find no warrant for such action.

*Indian tribal lands.* What has been said also disposes of the contention in relation to this part of the area.

Appellants say that title was originally in the United States for the benefit of Indians on the Colville Reservation. Executive Order of July 2, 1872. While at a later date the lands were opened for entry (Act of March 22, 1906, 34 Stat. 80; Proclamation of the President, May 3, 1916, 39 Stat. 1778) it appears that they were withdrawn before any entry was made. Appellants concede that title to these lands has always been in the United States and hence could not have been acquired by purchase or condemnation. But with respect to such lands exclusive legislative authority would be obtained by the United States only through cession by the State. *Surplus Trading Co.* v. *Cook, supra,* p. 651. If they may be deemed to be within the reference in § 8108 to "public land" which "may be set apart by the general government" for the purposes "before mentioned," we are brought back to the questions already discussed and we need not consider the question whether these lands had in fact been set apart in the prescribed manner.

Our conclusion is that the State had territorial jurisdiction to impose the tax upon appellants' receipts and that the tax does not lay an unconstitutional burden upon the Federal Government.

The respective judgments are

*Affirmed.*

MR. JUSTICE MCREYNOLDS, MR. JUSTICE SUTHERLAND, MR. JUSTICE BUTLER and MR. JUSTICE ROBERTS dissent for the reasons stated in the dissenting opinion in *James* v. *Dravo Contracting Co., ante,* p. 161.