STATE OF NORTH CAROLINA v. CARLTON JAMES SMITH

No. 130PA89

(Filed 7 February 1991)

**Courts § 135 (NCI4th)— murders by juvenile on military base—
superior court without jurisdiction**

The Onslow County Superior Court did not have concur-
rent jurisdiction to try a person as an adult for murders he
allegedly committed as a juvenile on the Camp Lejeune military
reservation where the State has ceded and the federal govern-
ment has accepted exclusive jurisdiction over this territory,
and the United States Attorney certified to the United States
District Court pursuant to 18 U.S.C. § 5032 that the courts
of North Carolina did not have jurisdiction over the defendant
with respect to the acts committed on the military reservation.
N.C.G.S. § 104-7; Art. I, § 8 of the U.S. Constitution.

**Am Jur 2d, Courts §§ 11-13.**

Justice MARTIN concurring.

ON writ of certiorari to review an order entered by *Strickland,
J.,* at the 23 February 1989 Session of Superior ·Court, ONSLOW
County. Heard in the Supreme Court 15 March 1990.

The defendant has been indicted on three charges of murder
in the Superior Court, Onslow County. On 24 August 1981, when
the defendant was fifteen years of age, the bodies of Connie Smith,
Sharon Lee Sager, and Tyler Dash were found on the Marine Corps
Base, Camp Lejeune, North Carolina. The area in which the bodies
were found was purchased by the United States in 1941. In a
letter to J. Melville Broughton, the Governor of North Carolina,
dated 4 June 1941, Acting Secretary of the Navy James Forrestal
notified the Governor that an Act of Congress required that in
any case in which a State cedes jurisdiction over lands within
its borders to the United States the head of any department having
custody of such lands, shall, if such jurisdiction be accepted, file
a notice of such acceptance with the Governor of such state ceding
such jurisdiction. Acting Secretary Forrestal notified Governor
Broughton that jurisdiction was accepted over the land effective
at 12:00 noon on 9 June 1941 "in the manner and form provided
by an act of 1907, Ch. 25, N.C. Code 1927, Sec. 8059." This is

STATE v. SMITH

[328 N.C. 161 (1991)]

now N.C.G.S. § 104-7. On 24 August 1981 an assistant district attorney of the Fourth Prosecutorial District wrote to an assistant United States Attorney that, "[i]t has always been my understanding that criminal offenses occurring on the Marine Corps installations in Onslow County fall exclusively within the federal jurisdiction. Even assuming concurrent jurisdiction exists, we will defer to cognizant federal authorities in this case."

On 8 July 1986 the federal government filed a juvenile information against the defendant, charging him with three counts of first degree murder. The information alleged that the murders were committed in violation of 18 U.S.C. § 1111 (1982) on the Marine Corps Base, Camp Lejeune, North Carolina under the exclusive jurisdiction of the United States. On the same day the United States Attorney certified to Chief Judge W. Earl Britt, United States District Court for the Eastern District of North Carolina, that pursuant to 18 U.S.C. § 5032 (1982) on the authority delegated to him by the Attorney General of the United States "no juvenile court or other appropriate court of any state, including the General Court of Justice of the State of North Carolina, has jurisdiction over said juvenile with respect to acts of juvenile delinquency alleged in this case, such acts having occurred on Marine Corps Base, Camp Lejeune, North Carolina, a military reservation acquired for the use of the United States and under exclusive jurisdiction thereof."

On 28 July 1986 the government's motion to transfer the defendant to United States District Court for trial as an adult was allowed. On appeal to the Fourth Circuit Court of Appeals this order was reversed. At the time the three persons were killed on the Camp Lejeune reservation a fifteen-year-old person who was convicted of first degree murder could be committed to a relatively short period of confinement or treatment. In 1984 the federal Juvenile Delinquency Act was amended to provide that a fifteen year old charged with murder could be tried as an adult and sentenced to life imprisonment or possibly death. The Fourth Circuit Court of Appeals held that it would violate the ex post facto clause of article I, section 9 of the United States Constitution to try the defendant under an act which was not in effect at the time the alleged crimes were committed and which would enhance the sentence which the defendant could receive. *United States v. Juvenile Male*, 819 F.2d 468 (4th Cir. 1987).

## STATE v. SMITH

[328 N.C. 161 (1991)]

The United States Attorney then sought and was granted leave to dismiss the information. A federal grand jury then indicted the defendant on three counts of first degree murder. The district court denied a motion to dismiss the indictment and this order was reversed on appeal. The United States Court of Appeals for the Fourth Circuit held that once the government proceeded against a person under the Juvenile Delinquency Act it could not proceed against him under another act. *United States v. Smith*, 851 F.2d 706 (4th Cir. 1988). The indictment against the defendant was dismissed.

On 13 December 1988, the Onslow County grand jury indicted the defendant for the murders of the three persons whose bodies had been found on 24 August 1981. The superior court denied a motion to dismiss the indictments and we granted the defendant's petition for certiorari.

*Lacy H. Thornburg, Attorney General, by Robert J. Blum, Associate Attorney General, and G. Lawrence Reeves, Jr., Assistant Attorney General, for the State.*

*Charles H. Henry, Jr. and Richard L. Cannon, III, for defendant appellant.*

WEBB, Justice.

This case brings to the Court the question of whether the Superior Court, Onslow County has jurisdiction to try a person as an adult for crimes he allegedly committed as a juvenile on the Camp Lejeune military reservation. There are constitutional and statutory provisions that affect this question. Article I, § 8 of the Constitution of the United States provides in part:

The congress shall have power. . . .

. . . .

[17.] To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the

same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings[.]

N.C.G.S. § 104-7 provides in part:

> The consent of the State is hereby given, in accordance with the seventeenth clause, eighth section, of the first article of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in the State required for the sites for customhouses, courthouses, post offices, arsenals, or other public buildings whatever, or for any other purposes of the government.
>
> Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State; but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands. The jurisdiction ceded shall not vest until the United States shall have acquired title to said lands by purchase, condemnation, or otherwise.

40 U.S.C. § 255 provides in part:

> Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted.

STATE v. SMITH

[328 N.C. 161 (1991)]

In interpreting article I, § 8 of the Constitution of the United States and the statutory provisions, it has been held that if several steps are taken the federal government acquires jurisdiction over lands it owns. The government must acquire the land by condemnation or otherwise. If the state in which the land is situated cedes jurisdiction to the federal government, and if the government accepts jurisdiction, the state no longer has jurisdiction over this territory. *Paul v. United States*, 371 U.S. 245, 9 L.Ed.2d 292 (1963). Whether the United States has acquired jurisdiction is a federal question. *Silas Mason Co. v. Tax Com.*, 302 U.S. 186, 82 L.Ed. 187 (1937).

In this case all parties agree that the murders allegedly occurred on the Camp Lejeune military reservation and that the State has ceded and the federal government has accepted jurisdiction over this territory. The State contends the government's jurisdiction is not exclusive and the State has jurisdiction to try the defendant.

In criminal cases dealing with this problem the federal courts have said the jurisdiction of the United States is exclusive. In *United States v. Unzeuta*, 281 U.S. 138, 74 L.Ed. 761 (1930), the defendant assigned error for being tried in federal court for a murder committed on the Fort Robinson military reservation in Nebraska. In overruling this assignment of error the United States Supreme Court said, "[w]hen the United States acquires title to lands, which are purchased by the consent of the legislature of the state within which they are situated 'for the Erection of Forts, Magazines, Arsenals, Dock-yards and other needful Buildings' (Const. art. I, § 8) the Federal jurisdiction is exclusive of all state authority." *Id.* at 285, 74 L.Ed. at 773. In *Bowen v. Johnston*, 306 U.S. 19, 83 L.Ed. 455 (1939), the defendant was convicted of a murder committed in the Chickamauga and Chattanooga National Park. The United States Supreme Court said the federal district court had exclusive jurisdiction to try the defendant for crimes committed in this territory. *See also Benson v. United States*, 146 U.S. 325, 36 L.Ed. 991 (1892).

In *United States v. Daye*, 696 F.2d 1305 (11th Cir. 1983), the Court of Appeals for the Eleventh Circuit, in overruling the defendant's assignment of error to his being tried in federal court, said, "because the Everglades National Park remains in the exclusive jurisdiction of the federal government, Florida has not and cannot

extend its jurisdiction to cover Indian lands located within the Park." In *State v. DeBerry*, 224 N.C. 834, 32 S.E.2d 617 (1945), this Court, relying on federal cases, held it was error not to abate a criminal action for assault on a female which occurred on the premises of a post office. We said that at the time the United States acquired the land for the post office, "the Legislature had given its unqualified consent to the acquisition of lands within the State by the United States for the purpose of erecting thereon any post office, courthouse, etc., and the Federal jurisdiction therefore became exclusive." *Id.* at 837, 32 S.E.2d at 619. It appears from these cases that the Superior Court, Onslow County does not have jurisdiction to try the defendant.

The State argues that the federal government has not exercised exclusive jurisdiction over juvenile delinquency offenses which occur on the Camp Lejeune military reservation. It bases this argument on *Paul v. United States*, 371 U.S. 245, 9 L.Ed.2d 292; *Howard v. Commissioners of Sinking Fund of City of Louisville et al.*, 344 U.S. 624, 97 L.Ed. 617 (1953); *Stewart v. Sadrakula*, 309 U.S. 94, 84 L.Ed. 596 (1940); and *Chicago R.I. & P. Ry. Co. v. McGlinn*, 114 U.S. 542, 29 L.Ed. 270 (1885). These decisions have developed the doctrine that in civil cases the state laws in existence on federal enclaves at the time of the cession of the territory continue in effect until abrogated by the federal authority. This assures that no area, however small, will be left without a developed legal system for private rights. The State argues that the areas of interest to both sovereigns may co-exist within the enclave so long as there is no interference with the federal function.

The State argues that the federal government has not abrogated State jurisdiction over juvenile offenders on the Camp Lejeune military reservation and the State has concurrent jurisdiction. It relies on 18 U.S.C. § 5032 which says in part:

> A juvenile alleged to have committed an act of juvenile delinquency, other than a violation of law committed within the special maritime and territorial jurisdiction of the United States for which the maximum authorized term of imprisonment does not exceed six months, shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume

jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles. . . .

If the Attorney General does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such State.

The State contends that this statute and other legislative action show it was and is the position of Congress that states are better able to deal with the juvenile delinquency problems than federal authorities. The State concedes that it normally would not have jurisdiction over criminal matters but says in this case that a juvenile delinquency hearing is a civil matter. Once the state court obtained jurisdiction it did not lose it when the defendant became an adult. The State contends it has concurrent jurisdiction because the federal government has never accepted jurisdiction over juvenile matters on the Camp Lèjeune reservation. It argues that 40 U.S.C. § 255 allows the federal government only the jurisdiction it requires.

The difficulty for the State in relying on 18 U.S.C. § 5032 to argue that the federal government recognizes that states are better able to deal with juvenile delinquency problems than the federal government is that the United States Attorney certified to the United States District Court pursuant to 18 U.S.C. § 5032 that the courts of North Carolina did not have jurisdiction over the defendant with respect to the acts committed on the Camp Lejeune military reservation. In *United States v. Vancier*, 515 F.2d 1378 (2nd Cir.), *cert. denied*, 423 U.S. 857 (1975), a juvenile was charged in the United States District Court for the Southern District of New York with an act of juvenile delinquency. He was also charged with a criminal act in a court in the State of New York. The United States Attorney certified to the federal district court that a juvenile or other appropriate court did not have jurisdiction over the defendant with respect to the alleged acts of juvenile delinquency. The state court dismissed the charges and the defendant was held in federal court to be a juvenile delinquent. On appeal he contended he should not have been tried in federal court because the state court had jurisdiction. The Second Circuit Court of Appeals held that the United States Attorney's certification, in the absence of a showing of bad faith, had to be accepted by the Court as final. It held the federal district court had exclusive jurisdiction. Because we are dealing with a federal question we must look to

the federal courts for guidance. If we must accept the United States Attorney's certification as final that the courts of this state do not have jurisdiction, then 18 U.S.C. § 5032 is not helpful to the State.

As to the State's argument that the federal government never accepted jurisdiction of juvenile delinquency matters on the Camp Lejeune reservation, the acceptance of Acting Secretary of the Navy Forrestal said that jurisdiction was "accepted on behalf of the United States in the manner and form provided by an act of 1907, Ch. 25, N.C. Code 1927, Sec. 8059" (N.C.G.S. § 104-7). N.C.G.S. § 104-7 says, "[e]xclusive jurisdiction . . . shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State." It appears that the State ceded all jurisdiction that it could except for the service of process and this is what the United States accepted.

The State says that Acting Secretary Forrestal could not have accepted jurisdiction of persons charged with acts of juvenile delinquency because he did not know "the many complexities of jurisdictional law that would arise in the future." Whatever the Acting Secretary could foresee, we believe he accepted exclusive jurisdiction as completely as he could. The state and federal governments had laws in effect governing matters of juvenile delinquency at the time jurisdiction was ceded. There is nothing in either of the two opinions of the Court of Appeals for the Fourth Circuit dealing with this defendant that would indicate the district court did not have jurisdiction to conduct an adjudication of delinquency for this defendant.

As to the State's contention that a juvenile delinquency hearing is a civil matter in both federal and state courts and for that reason the state and federal governments have concurrent jurisdiction, it is true that in *Kent v. United States*, 383 U.S. 541, 16 L.Ed.2d 84 (1966), the United States Supreme Court said juvenile delinquency proceedings are designated civil and not criminal. Subchapter XI of Chapter 7A of the General Statutes, which contains the North Carolina Juvenile Code, does not classify a juvenile hearing as civil or criminal. We cannot find a case in this state which says a juvenile proceeding is a civil case. In regard to juvenile proceedings this Court has held that "[w]hatever may be their proper classification, they certainly are not 'criminal prosecutions' " which require a jury trial or a trial at which the public must

be admitted. *In re Burrus*, 275 N.C. 517, 529, 169 S.E.2d 879, 886 (1969). There are certain constitutional rights which a juvenile has at such a hearing which are not required in civil trials, such as the right to counsel if there is a possibility of commitment and the privilege against self-incrimination. This would suggest a juvenile hearing is not a civil case. We do not believe we have to decide whether a juvenile hearing is civil or criminal. In this case the proceedings against the defendant in the Superior Court, Onslow County are criminal proceedings. His case was transferred to superior court for trial on three charges of murder.

Bound as we are by the federal court's interpretation of this federal question, we must hold that the Superior Court, Onslow County does not have jurisdiction to try the defendant. If we were to hold otherwise we would have to overrule *State v. DeBerry*, 224 N.C. 834, 32 S.E.2d 617. As Chief Justice Stacy said in *DeBerry*, "[t]his may lead to an undesirable result. Nevertheless, we can only declare the law as we find it." *Id.* at 837, 32 S.E.2d at 619.

We reverse the order of the superior court and remand for the dismissal of the three charges against the defendant.

Reversed and remanded.

Justice MARTIN concurring.

I concur in the result reached by the majority but for different reasons.

A review of the history of this appeal is helpful to an understanding of the issues involved.

1. On 24 August 1981 Connie Smith, Tyler Todd, and Sharon Sager were found murdered in a residence located at 6080-A Kentucky Court in the Watkins Village housing area of the Camp Lejeune Marine Corps base. The victims were the defendant's aunt, his twelve year old sister, and his cousin.

2. On 24 August 1981 this defendant was fifteen years of age and resided with his mother and two sisters on the Marine Corps base at Camp Lejeune.

3. The defendant was immediately a suspect in the case. However, federal authorities evidently concluded that they did

not have sufficient evidence to proceed, and by 1983 they had lost track of this defendant altogether.

4. Sometime after the murders, defendant Smith moved with the remainder of his family to Oregon.

5. In 1986 defendant wanted to join the Oregon National Guard. That organization contacted Camp Lejeune for copies of defendant's medical records. Upon receipt of the records which included psychiatric reports, defendant was turned down for the National Guard. Defendant's mother contacted Camp Lejeune and asked that the investigation concerning defendant be closed so that he could "get on with his life." Agents from the Naval Investigative Service contacted defendant and conducted a number of interviews with him. At one of those interviews, defendant made incriminating statements concerning the murders and was arrested on 30 June 1986.

6. On 7 July 1986 Samuel T. Currin, United States Attorney, through his assistant, M.F. Bogdanos, filed a certificate with the Federal Court for the Eastern District of North Carolina certifying "no Juvenile Court or other appropriate court of any state including the General Court of Justice of the State of North Carolina has jurisdiction over said juvenile with respect to the acts of juvenile delinquency alleged in this case, such acts having occurred on Marine Corps base at Camp Lejeune, North Carolina, a military reservation acquired for the use of the United States and under exclusive jurisdiction thereof."

7. On 8 July 1986 the federal government filed a "juvenile information" charging defendant with these three murders, and a magistrate found probable cause to believe that "the juvenile committed the offenses alleged."

8. On 22 July 1986 the U.S. District Judge entered an order upon motion of the government transferring this case to the District Court for trial of the defendant as an adult. This order was appealed to the United States Court of Appeals, Fourth Circuit.

9. On 26 May 1987 the United States Court of Appeals, Fourth Circuit, entered a decision reversing the order of the trial court transferring this defendant's case for trial as an adult. The court held that at the time of the commission of these alleged crimes (24 August 1981) there was no provision in

the Federal Juvenile Delinquency Act which would permit the transfer of a juvenile's case to the District Court for trial as an adult. Although the statute in effect in 1981 was amended in 1984 to allow such transfer, the amendment could not be applied to this defendant for these alleged crimes as that would constitute a violation of the *ex post facto* clause of the United States Constitution. *United States v. Juvenile Male*, 819 F.2d 468 (4th Cir. 1987).

10. On 6 July 1987 the United States District Judge entered an order granting leave to the government to dismiss the juvenile information, and this dismissal was taken by the government.

11. On 7 July 1987 the United States government procured a true bill of indictment from the grand jury charging this defendant with three counts of murder in the first degree involving these alleged killings and a fourth count of escape.

12. On 8 July 1987 the defendant made a motion to dismiss the bills of indictment which was denied by the Federal Court on 3 December 1987. Notice of Appeal was taken to the United States Court of Appeals, Fourth Circuit.

13. The Court of Appeals on 12 July 1988 reversed the District Court Judge ordering that the three murder charges should have been dismissed.

14. On 14 December 1988 the United States District Judge entered an order pursuant to the Fourth Circuit opinion dismissing the three murder charges against this defendant. The theory of the Fourth Circuit decision was that the initiation of the juvenile proceedings against this defendant, which the government had previously dismissed, prevented the government from later prosecuting him as an adult by way of a bill of indictment.

15. Thereafter, on 12 January 1989 the government dismissed the escape charge with the consent of the Federal Court.

16. On 13 December 1988 the Onslow County grand jury returned indictments charging defendant with the 24 August 1981 murders of his aunt, cousin, and sister.

17. Defendant entered pleas of not guilty at his arraignment on 25 January 1989.

18. On 13 February 1989 defendant filed two motions to dismiss for lack of jurisdiction.

19. On 23 February 1989 Judge Strickland denied these motions. Whereupon the case was appealed to this Court.

At the outset, the validity of *State v. DeBerry*, 224 N.C. 834, 32 S.E.2d 617 (1945), is not necessary to a resolution of this appeal. This Court in *DeBerry* only held that N.C.G.S. §§ 104-1 and 104-7 did not apply to property acquired by the United States in 1899, years before the statutes were adopted. The case at bar is not concerned with the retroactivity of the statutes. The "unqualified consent" by the state to the federal acquisition of the post office property in *DeBerry* was based upon legislation adopted in 1887, not N.C.G.S. § 104-7. *DeBerry* is not relevant to the issue before the Court at this time.

The legal issue involved in this case is not the guilt or innocence of the defendant of the murders in question. The defendant has made a judicial stipulation that on 24 August 1981 the three victims were found *murdered* in a residence on the Marine Corps base at Camp Lejeune. The only question remaining as to guilt or innocence is whether this defendant was the perpetrator of the three murders, or any one or more of them. Defendant has made incriminating statements to Naval Investigative Service agents from which a jury could conclude that defendant was the person who perpetrated the crimes.

The issue before this Court is whether the Superior Court of Onslow County had jurisdiction to try this defendant upon the bills of indictment returned against him for the murders. The resolution of this issue depends upon this Court's interpretation of the United States Constitution, state and federal statutes, and the acts of the state and federal governments with respect to the acquisition of the land by the United States government upon which Camp Lejeune is now situated and within which the murders in this case occurred.

At the time of the murders in question there was no provision in the Federal Juvenile Delinquency Act for the trial of a juvenile as an adult when charged with such serious offenses as murder. The most that the federal government could do under the Federal Juvenile Delinquency Act at that time was to have a juvenile delinquency adjudication proceeding.

STATE v. SMITH

[328 N.C. 161 (1991)]

The United States government in 1981, at the time of these crimes, had no provision to try as an adult a juvenile who had committed three murders. Under the law of North Carolina in 1981, the defendant could be tried as an adult for the offense of murder. Where there is a gap in jurisdiction of the United States, upon the ceding of territorial jurisdiction by the state to the United States, the state retains its underlying territorial jurisdiction over the area in question insofar as the exercise of such jurisdiction by the state does not interfere with the activities of the federal government in carrying out its duties upon the federal enclave. However, the Federal Assimilative Crimes Act cures this gap in the federal jurisdiction. This act reads:

Laws of States adopted for areas within Federal jurisdiction

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title [18 USC § 7], is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13 (1948).

The provisions of this Act have been in effect since 1825. The purpose of this statute is to provide for punishment in the federal courts, as an offense against the United States, of offenses committed within federal enclaves, but only in the way and to the extent that the offense in question would have been punishable if committed within the jurisdiction of the state. *United States v. Press Publishing Co.*, 219 U.S. 1, 55 L. Ed. 65 (1910). It provides criminal laws for federal enclaves by use of the state law to fill gaps in federal criminal law. *United States v. Brown*, 608 F.2d 551 (5th Cir. 1979). Where Congress has failed to pass specific criminal legislation, the Act is used to fill the gaps in criminal law in federal enclaves. *United States v. Fulkerson*, 631 F. Supp. 319 (D. Haw. 1986).

In 1981, the federal law failed to provide for the trial of a juvenile for the crime of murder committed within a federal enclave. The juvenile could only be proceeded against under the Federal

Juvenile Delinquency Act. Such proceedings are civil rather than criminal. *Kent v. United States*, 383 U.S. 541, 16 L. Ed. 2d 84 (1966). The juvenile court basically is determining the needs of the child and society rather than adjudicating criminal conduct or fixing criminal responsibility, guilt, or punishment. *Id.* Thus, in 1981, the federal laws failed to provide for the trial of this defendant, a juvenile, on criminal charges of murder.

To the contrary, North Carolina in 1981 did provide for the trial of a juvenile for the crime of murder. The statute, passed in 1979, reads:

> The court after notice, hearing, and a finding of probable cause may transfer jurisdiction over a juvenile 14 years of age or older to superior court if the juvenile was 14 years of age or older at the time he allegedly committed an offense which would be a felony if committed by an adult. If the alleged felony constitutes a capital offense and the judge finds probable cause, the judge shall transfer the case to the superior court for trial as in the case of adults.

N.C.G.S. § 7A-608 (1989).

Therefore, by applying the Federal Assimilative Crimes Act, thereby incorporating N.C.G.S. § 7A-608 as a part of the federal criminal law, the United States had jurisdiction to try this defendant for the capital charges of murder. Because the federal government thereby had jurisdiction to try this defendant on the murder charges, the state lacked jurisdiction to do so.

Inexplicably, counsel and the court failed to recognize and apply the Federal Assimilative Crimes Act in deciding and reviewing the issue of whether this defendant could be tried as an adult in the federal court for these three murders. *See United States v. Juvenile Male*, 819 F.2d 468 (4th Cir. 1987). Had the federal court done so, these murder cases could have been adjudicated in 1987. Nevertheless, the actions of the federal court cannot serve to expand the jurisdiction of the courts of this state.

For these reasons, I concur in the result.