## ATLANTIC MARINE CORPS COMMUNITIES, LLC,
Plaintiff,

v.

## ONSLOW COUNTY, NORTH CAROLINA and Craven County, North Carolina, Defendants.

No. 7:06–CV–35–H.

United States District Court,
E.D. North Carolina,
Southern Division.

July 26, 2007.

Charles Henry Mercer, Jr., Reed J. Hollander, Stephen D. Martin, Nelson Mullins Riley & Scarborough, LLP, Raleigh, NC, for Plaintiff.

Ronald E. VonLembke, Jacksonville, NC, Bryant Kyle Dickerson, James R. Sugg, Sr., Scott C. Hart, Sumrell, Sugg, Carmichael, Hicks & Hart, P.A., New Bern, NC, for Defendants.

## ORDER

MALCOLM J. HOWARD, Senior District Judge.

This matter is before the court on the parties' cross-motions for summary judgment [DE # 28, 31]. Appropriate responses and replies have been filed, and the time for further filings has expired. A hearing was held before the undersigned on June 14, 2007, at the United States Courthouse in Greenville, North Carolina. This matter is ripe for adjudication.

### *STATEMENT OF THE CASE*

Atlantic Marine Corps Communities, LLC ("AMCC"), seeks a declaratory judgment that certain properties located at Marine Corps Air Station New River

("MCAS New River"), Marine Corps Base Camp Lejeune ("MCB Camp Lejeune"), and Marine Corps Air Station Cherry Point ("MCAS Cherry Point") are under exclusive federal jurisdiction and not subject to ad valorem taxation by Onslow and Craven Counties. Defendants counterclaim, seeking a declaration that the properties are subject to local taxation. At issue, according to the counties' tax administrators, is approximately $1.75 million in *annual* tax revenues beginning in 2006, increasing to more than $2.5 million in 2012. The case is now before the court on the parties' cross-motions for summary judgment.

## STATEMENT OF THE FACTS

The United States Constitution, in what is commonly referred to as the Enclave Clause, grants Congress power

> [t]o exercise exclusive Legislation in all cases whatsoever, over such District . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I, § 8, cl. 17.

On January 24, 1907, referencing the Enclave Clause, the North Carolina General Assembly passed "An Act Ceding to the United States Exclusive Jurisdiction over Certain Lands Acquired for Public Purposes within this State, and Authorizing the Acquisition Thereof," Chapter 25, Public Laws of 1907.

> The consent of the state is hereby given, in accordance with [the Enclave Clause], to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in the state required for the sites for customhouses, courthouses, postoffices, arsenals or other public buildings whatever, or for any other purposes of the government.
>
> Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this state; but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands. The jurisdiction ceded shall not vest until the United States shall have acquired title to said lands by purchase, condemnation, or otherwise.
>
> So long as the said lands shall remain the property of the United States when acquired as aforesaid, and no longer, the same shall be and continue exempt and exonerated from all state, county, and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this state. (1907, c. 25; C.S. 8059.)

N.C. Gen.Stat. § 104–7 (1943).[1]

In 1941, the federal government could obtain exclusive jurisdiction ceded by a state only by acquiring the subject lands *and* affirmatively accepting exclusive jurisdiction. Acquisition of lands was accomplished by various means, among them purchase, condemnation, and a variety of other conveyances resulting in transfer of a fee interest to the federal government. By federal statute, acceptance was not automatic but could be effected by the head of the department having control over the lands through the filing of a notice of acceptance with the Governor of the ceding state. 40 U.S.C. § 255 (1940).

---

**1.** Substantially the same language appears in the original Act and 132 N.C.Code Consol. § 8059 (1939), later recodified at N.C. Gen. Stat. § 104–7 (1943). The court hereinafter refers to these statutory sources collectively as "§ 104–7" except where noted.

It is at this point undisputed that, in 1941, the federal government acquired certain lands located in Onslow County and Craven County for the establishment of Marine Corps Training Areas. (*See* Compl. ¶¶ 16–34.) The federal government acquired the lands at issue in this case following separate Acts of Congress leading to petitions for and eventual entry of six condemnation orders in the United States District Court for the Eastern District of North Carolina between April 3 and October 1, 1941. By virtue of these condemnation orders, fee simple title to all of the lands at issue in this case vested in the United States. (*See* Compl. Exs. 6, 9, 12, 15, 18 & 21.) The lands at issue include portions of MCAS New River, MCB Camp Lejeune, and MCAS Cherry Point (hereinafter collectively referred to as the "Marine Corps Lands").

The federal government's acceptance of exclusive jurisdiction over the lands covered by five of the six condemnation orders is unquestioned. As to these five, in 1941, Acting Secretary of the Navy James Forrestal sent letters to North Carolina Governor J. Melville Broughton accepting jurisdiction "on behalf of the United States in the manner and form provided by an Act of 1907, Ch. 25, N.C.Code 1927, Sec. 8059, over certain lands in Onslow [or Craven] County." (Compl.Exs.22–26.) These letters concerned the lands at MCAS New River and MCB Camp Lejeune. All five letters were countersigned and returned to the Navy.

Plaintiff claims that a sixth letter was sent accepting jurisdiction over the land at MCAS Cherry Point (Compl Ex. 27). Defendants dispute this, pointing to the absence of a countersigned copy as evidence that the letter was never sent. Plaintiff submitted, as additional probative evidence, a document entitled "Summary of activities, method of acquisition, areas and jurisdiction," from the records of Governor J. Melville Broughton, Agencies, Commissions, Departments, and Institutions, 1941–1944, Navy Department, Box 59. (Pl.'s Mem. Supp. Summ. J. Ex. 1.) This document lists a 7582.2 acre portion of MCAS Cherry Point acquired by condemnation on September 26, 1941 (the same date the United States filed its Petition for Condemnation and Declaration of Taking as to the MCAS Cherry Point land). A handwritten notation indicates a "jurisdiction date" for this property of December 16, 1941, the same date plaintiff claims the sixth letter was sent by Secretary Forrestal to Governor Broughton.

Defendants' objections notwithstanding, the confluence of actions detailed above has been widely treated over the past half-century as having vested exclusive jurisdiction over the Marine Corps Lands in the federal government (with the service of process exceptions noted in § 104–7). Ever since the dates of the federal government's purported acceptance of exclusive jurisdiction over the Marine Corps Lands, defendants have not, on said Lands: conducted health inspections of private food vendors; conducted building inspections under the county's building code; provided waste removal services; attempted to enforce criminal laws (with one exception, *see State v. Smith*, 328 N.C. 161, 400 S.E.2d 405 (1991)); provided fire and police protection, except by interlocal agreement with the United States; or attempted to tax real and personal property of non-governmental entities, except where authorized by federal statute.[2]

In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"),

---

**2.** This last statement excludes, of course, the instant action and the proceedings leading up to it.

giving authority to the Secretaries of the Armed Forces to acquire or construct family housing units or military unaccompanied housing units on or near military installations within the United States. National Defense Authorization Act for Fiscal Year 1996, § 2601(a)(1), 10 U.S.C. § 2872 (West 2007). Under the MHPI, Secretaries may invest in eligible nongovernmental entities conducting projects "for the acquisition or construction of housing units suitable for use as military family housing or as military unaccompanied housing." *Id.*, 10 U.S.C. § 2875.

Pursuant to the MHPI, after a competitive bidding process, the Department of the Navy selected Actus Lend Lease, LLC ("Actus")[3] to engage in a public/private venture with the government to renovate, demolish, and construct military housing units on portions of the Marine Corps Lands (the "Project"). The Department of the Navy and Actus thereafter formed a limited liability company—plaintiff AMCC—and the federal government contracted with AMCC to conduct the Project.[4] The government conveyed to AMCC housing units and the income stream from military personnel renting those housing units through a fifty-year ground lease of the units and related infra-

structure. (*See* Def.'s Mem. Supp. Summ. J. Exs. 1 (Invitation for Offers) & 4 (Ground Lease and Conveyance Agreement).) Fee title to the land remained vested in the government. (*See id.* Ex. 4, p. 3.) Title to the housing units and infrastructure passed to AMCC, with the proviso that title to these assets and all related improvements would be transferred back to the government, or other then-owner of the land, upon expiration or termination of the lease. (*See id.* Ex. 1, p. 20; Ex. 4, pp. 3–4.)[5]

The Limited Liability Company Operating Agreement of AMCC ("Operating Agreement") provided that AMCC was organized, among other things, to "own, lease, manage, acquire, operate and maintain Improvements and the Land." (*Id.* Ex. 3, p. 2.) The government "shall not take part in the management of [AMCC], transact any business for or in the name of [AMCC], or have the right or power to sign documents for or otherwise bind [AMCC]." (*Id.* Ex. 3, p. 18.) Pursuant to the Operating Agreement, assets are owned by AMCC as an entity, and the government has no ownership interest in any AMCC assets in its individual name or right; "each member's Company Interest shall be personal property for all purposes." (*Id.* Ex. 3, p. 36.)[6] Companies

---

3. Actus Lend Lease Holdings, LLC is a subsidiary of Actus Lend Lease, LLC. AMCC Managing Member, LLC is a subsidiary of Actus Lend Lease Holdings, LLC. All will be referred to throughout this order simply as "Actus."

4. As discussed at the hearing held in this matter, Actus retains a 2/3 interest in AMCC; the Department of the Navy retains a 1/3 interest in AMCC. Actus is a member and the "Managing Member" of AMCC; the government is a member,

5. Pursuant to the Ground Lease and Conveyance Agreement, the Department of the Navy "granted, bargained, sold, conveyed and released [to AMCC] all facilities and improve-

ments, including the existing Housing Units and any equipment, alterations, additions, streets, sidewalks, driveways, utilities, roads, infrastructure, and attached fixtures located in, on and under the Land ... together with all and singular, the rights, hereditaments and appurtenances to such Existing Improvements belonging, or in anyway incident or appertaining to the Existing Improvements[.]" (*Id.* Ex. 4, p. 3.)

6. The "Company" here referred to is AMCC. "Company Interest" means, "with respect to each member of the Company, its Capital Account, right to distributions under this Agreement, right of governance and any other rights that it has in the Company." (*Id.* Ex. 3, p. A–5.) As the court understands it, all build-

bidding on the Project were required to "assume that full property taxes and/or possessory taxes will be assessed ... and include all such costs in their financial projections." (*Id.* Ex. 1, p. 3.)

The Operating Agreement and Ground Lease were executed on October 1, 2005. On October 6, 2005, defendant Onslow County informed Actus of its determination that "the interests held by Atlantic Marine Corps Communities LLC in the properties identified in the Department of the Navy's housing privatization initiative at Marine Corps Base Camp, Camp Lejeune, North Carolina, and Marine Corps Air Station [New River], North Carolina are subject to taxation." (Compl.Ex.31.) Defendant Craven County followed Onslow County's lead in December 2005. (Compl.Ex.32.) Plaintiff instituted this action to avoid defendants' attempts to tax its property located on the Marine Corps Lands, asserting that local taxation of such assets would be improper because the Marine Corps Lands remain under exclusive federal jurisdiction.

### COURT'S DISCUSSION

## I. Justiciability

■ At the hearing held in this matter, the court voiced its concern that this case might not be ripe for review, noting that although the defendants have threatened to tax plaintiff, the subject properties have never actually been listed for taxation, and no taxes have been assessed. Neither party contests ripeness, but it is nevertheless this court's duty to inquire into the ripeness component of the case or controversy requirement.

ings, structures, improvements, and permanent fixtures on the land, and all rights and privileges belonging or in any way appertaining thereto, are real property under state law. N.C. Gen.Stat. § 105–273(13). So, while de-

■ The court must withhold consideration of an issue until it is presented in "clean-cut and concrete form." *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir.2006). An issue is more likely to be found ripe if it is "predominantly legal" and not dependent on the potential occurrence of factual events. *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir.2007) (citing *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)). However, "[if an] injury is certainly impending, that is enough" to allow a party to pursue preventative relief. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Retail Indus. Leaders Ass'n*, 475 F.3d at 186.

Defendants admitted at the hearing that their sole reason for not yet assessing taxes on the subject properties has been to keep the large sum, which would likely remain unpaid during the pendency of this litigation, off of their accounting books. There is no doubt that injury to plaintiff is more than a mere potentiality and that if defendants prevail in this action they will immediately proceed to tax the properties. No further factual development is necessary, and withholding judicial consideration would cause hardship to the parties and would serve no useful purpose. *See Pacific Gas & Elec.*, 461 U.S. at 201, 103 S.Ct. 1713. Under these circumstances, the court finds the case fit for judicial

fendants at several points focus on their attempts to tax plaintiff's "personal property" alone, the court sees in their actions an attempt to tax plaintiff's real *and* personal property, and will address both in this decision.

review, notwithstanding the apparently contrary holding of the North Carolina Supreme Court in *Bragg Development Co. v. Braxton*, 239 N.C. 427, 79 S.E.2d 918 (1954).

## II. Standard of Review

Summary judgment is appropriate pursuant to Rule 56 of the Federal Rules of Civil Procedure when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. *Faircloth v. United States*, 837 F.Supp. 123, 125 (E.D.N.C.1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. *Faircloth*, 837 F.Supp. at 125.

## III. Analysis

Defendants offer two arguments in favor of their claim that plaintiff's assets located on the Marine Corps Lands are subject to ad valorem taxation. First, defendants argue that the North Carolina General Assembly never consented to the acquisition of the Marine Corps Lands by the federal government for purposes of establishing Marine Corps training areas. As a result, defendants claim, the federal government never obtained exclusive jurisdiction over the Lands. Second, defendants argue in the alternative that the federal government lost its exclusive jurisdiction over the Marine Corps Lands when it entered into its Ground Lease and Conveyance Agreement with plaintiff. For the reasons set forth below, the court rejects both arguments.

### A. The Federal Government Gained Exclusive Jurisdiction Over the Marine Corps Lands in 1941

 A state or its instrumentalities may not impose a tax on real or personal property located on lands over which the federal government has properly obtained, and continues to maintain, exclusive jurisdiction in full compliance with the Enclave Clause. *S.R.A. v. State of Minnesota*, 327 U.S. 558, 562–63, 66 S.Ct. 749, 90 L.Ed. 851 (1946); *Surplus Trading Co. v. Cook*, 281 U.S. 647, 657–58, 50 S.Ct. 455, 74 L.Ed. 1091 (1930). This is so unless the United States has authorized such a tax. *S.R.A.*, 327 U.S. at 562–63, 66 S.Ct. 749; *see, e.g.*, 10 U.S.C. § 2667(e) (authorizing

taxation of leasehold interests within federal property); 4 U.S.C. § 105 (authorizing taxation on sales or use of tangible personal property within federal areas). Simple ownership and use of state land by the federal government does not withdraw the land from state jurisdiction. *Surplus Trading Co.*, 281 U.S. at 650, 50 S.Ct. 455. Instead, jurisdiction is transferred only after cession by the State and acceptance by the federal government (or limited other methods of acquisition of jurisdiction not relevant here). *See Fort Leavenworth Railroad v. Lowe*, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885); 40 U.S.C. § 255 (1940); *Adams v. United States*, 319 U.S. 312, 314–15, 63 S.Ct. 1122, 87 L.Ed. 1421 (1943).

■ A state may reserve to itself concurrent jurisdiction or some other form of limited jurisdiction. Reservations, conditions, or qualifications in state statutes, or state constitutional provisions, may limit a state's cession of jurisdiction. *See, e.g., Fort Leavenworth*, 114 U.S. at 541–42, 5 S.Ct. 995; *James v. Dravo Contracting Company*, 302 U.S. 134, 148–49, 58 S.Ct. 208, 82 L.Ed. 155 (1937) (approving state statutory reservation of concurrent jurisdiction); *I.B.M. Corp. v. Evans*, 213 Ga. 333, 99 S.E.2d 220 (1957) (limiting cession in light of state constitutional provision denying legislature power to surrender state right to tax). One such reservation appears in the second paragraph of N.C. Gen.Stat. § 104–7: service of civil and criminal process.

### 1. *Cession of the Marine Corps Lands By the State*

■ Defendants claim that an additional condition was placed on the consent given by the North Carolina General Assembly in § 104–7. They argue that the statute

does not indicate consent to the cession of state jurisdiction over the Marine Corps Lands for the purposes for which the United States obtained those Lands; namely, for use as Marine Corps training areas. Defendants focus on the first paragraph of the statute:

> The consent of the state is hereby given, in accordance with [the Enclave Clause], to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in the state required for the sites for customhouses, courthouses, postoffices, arsenals or other public buildings whatever, or for any other purposes of the government.

N.C. Gen.Stat. § 104–7. Defendants argue that statutes ceding sovereign power must be strictly construed, citing *Trans-ohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 619 (D.C.Cir. 1992), and that a strict reading of § 104–7 indicates that the North Carolina General Assembly ceded jurisdiction to the federal government only "for purposes associated with federal public buildings," and not for other purposes, including establishment of Marine Corps training areas. (Def.'s Mem. Supp. Summ. J. at 13.) [7]

In evaluating defendants' argument, this court is not without significant guidance. The court should give "great weight to the views of the state court as to the intent and limitations" of § 104–7. *See Silas Mason Co. v. Tax Comm'n of State of Washington*, 302 U.S. 186, 206–07, 58 S.Ct. 233, 82 L.Ed. 187 (1937) (construing analogous Washington consent and cession statute). In *State v. Smith*, 328 N.C. 161, 400 S.E.2d 405 (1991), the North Carolina Supreme Court held that § 104–7, as passed in 1907, gave broad consent to the federal government's acquisition of land and cession of state jurisdiction: "It appears that

---

**7.** Each petition for condemnation states that the lands were selected for acquisition "for the purpose of the establishment and use of a Marine Corps Training Area" (Compl. Exs. 4, 7, 10, 13 & 16) or "... a Marine Corps Air Base." (Compl.Ex.19.)

[in § 104–7] the State ceded all jurisdiction that it could except for the service of process and this is what the United States accepted." *Id.* at 409.

Faced with the imposing barrier of *State v. Smith,* defendants suggest that the reach of the decision ought to be confined to *criminal prosecutions.* This court finds no support for defendants' contention. Though *State v. Smith* was a criminal case, the court's analysis concerned an omnibus jurisdictional issue that applies equally in civil and criminal cases.

Defendants further assert that the North Carolina Supreme Court failed to engage in a considered statutory analysis when it decided *State v. Smith* and that it therefore reached the wrong conclusion. Defendants deploy a veritable *cornu copiae* of interpretive canons in support of their argument. They invoke the canon *expressio unius est exclusio alterius,* which counsels that "when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list." *Evans v. Diaz,* 333 N.C. 774, 780, 430 S.E.2d 244 (1993). Thus, defendants claim, the language in § 104–7 referring to "customhouses, courthouses, postoffices, arsenals, or other public buildings" implies exclusion of anything not contained in or reasonably implied by that list, such as Marine Corps training areas. The complementary canons *ejusdem generis* and *noscitur a socii* are used by defendants to argue that the catch-all phrase at the end of the first paragraph of § 104–7, "or for any other purposes of the government," is a general statement that must be construed "to embrace only objects similar in nature to those objects

enumerated by the preceding specific words." *Washington State Dep't of Soc. and Health Servs. v. Guardianship Estate of Keffeler,* 537 U.S. 371, 384, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). Combining these three canons, defendants' statutory construction analysis would limit the applicability of § 104–7 to acquisition of land for the sites of federal public buildings like customhouses, courthouses, postoffices, and arsenals, and "for purposes associated with [such] federal public buildings." (Def.'s Mem. Supp. Summ. J. at 13.)

For additional support defendants argue: If the General Assembly had really wanted to cede state jurisdiction over lands acquired by the United States "for any [ ] purposes of the [federal] government," it would not have included specific language referencing "customhouses, courthouses, postoffices, arsenals or other public buildings." § 104–7. If these specific examples are to have any meaning at all, defendants conclude, they must be read to indicate a limitation on federal government usage to purposes associated with "public buildings," and the language "or for any other purposes of the government" must be construed merely "as an explanatory limitation on the extent of sovereignty the General Assembly was willing to cede[.]" (Def.'s Resp. Br. at 16.)

This court rejects defendants' assertion that § 104–7 must be strictly construed under applicable precedent. *Transohio Sav. Bank,* cited by defendants, invoked the "unmistakability" doctrine, a "special rule of contract interpretation that applies to contracts with the government," not a rule of construction applicable to consent and cession statutes. 967 F.2d at 618–19.[8]

---

**8.** Defendants also cite *Hearne v. Stanly County,* 188 N.C. 45, 123 S.E. 641 (1924). *Hearne* does no more than support what has now become the "well-established principle that municipalities, as creatures of statute, can exercise only that power which the legislature has conferred upon them." *Bowers v. City of* *High Point,* 339 N.C. 413, 451 S.E.2d 284, 287 (1994); *Homebuilders Assn. of Charlotte v. City of Charlotte,* 336 N.C. 37, 442 S.E.2d 45, 49 (1994). North Carolina case law reveals no analogous limitation on the *State's* ability to enact consent and cession statutes

The unmistakability doctrine is not applicable here.

Moreover, the court finds no relevant ambiguity in § 104–7. The phrase "or for any other purposes of the government" was a broad catch-all provision used by the North Carolina General Assembly to offer a broad grant of authority to the federal government. *See State v. Smith*, 400 S.E.2d at 409. Had the General Assembly intended the statute to mean what defendants now suggest it means, omission of the conjunction "or" and the word "other" would have been a far more logical textual choice ("or other public buildings whatever, [ ] for any [ ] purposes of the government."). As it stands, however, the court can see no reasonable reading of § 104–7 in light of the phrase "or for any other purposes of the government," other than the one adopted in *State v. Smith* ("the State ceded all jurisdiction that it could except for the service of process and this is what the United States accepted"). *Id.*

As to the General Assembly's reference to specific types of buildings in § 104–7, the court finds it entirely consistent with the statute's direct reference to the Enclave Clause. The General Assembly enacted § 104–7 in an environment of uncertain but expansive interpretation of the Enclave Clause. By 1907, attempts had been made to give the specific language in the Enclave Clause referring to "Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings," a restrictive reading utilizing the canon of *ejusdem generis*. *See New Orleans v. United States*, 35 U.S. 662, 10 Pet. 662, 9 L.Ed. 573 (1836); *United States v. Bevans*, 3 Wheat. 336, 16 U.S. 336, 4 L.Ed. 404 (1818). However, other cases foreshadowed a more liberal construction of the Enclave Clause. One such case made the "needful buildings" clause applicable to courthouses and customhouses. *Sharon v. Hill*, 24 F. 726, 730–31

(C.C.D.Cal.1885). Another, applying the clause to postoffices, was decided in 1908, though the facts and legal issue may have been on the minds of North Carolina legislators in 1907, when they drafted § 104–7. *Battle v. United States*, 209 U.S. 36, 37, 28 S.Ct. 422, 52 L.Ed. 670 (1908). In 1937, the Supreme Court held in *James*, 302 U.S. at 143, 58 S.Ct. 208, that the phrase "other needful buildings" in the Enclave Clause embraced "whatever structures are found to be necessary in the performance of the functions of the federal government." The Enclave Clause has also been extended to cover areas without buildings or other structures on them. *See Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 529–30, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938) (national parks).

Enacting § 104–7 in 1907, the North Carolina General Assembly knew that "needful buildings" meant more than forts, magazines, arsenals, and dockyards, but could not have known the full reach of the "needful buildings" clause as later explained in *James*. Their inclusion of the first catch-all phrase, "or other public buildings whatever," as well as the second, "or for any other purposes of the government," both speak to this uncertainty, and imply that the legislature intended its consent and cession statute to reach the farthest limits of the Enclave Clause, whatever they might be.

In light of the foregoing, the court finds that the words of § 104–7 and the context in which those words are used leave no ambiguity as to the proper construction. *See Ayes v. U.S. Dept. of Veterans Affairs*, 473 F.3d 104, 110–11 (4th Cir.2006). In such a situation, the plain meaning rule is the first and last canon in a court's analysis and "judicial inquiry is complete." *Id.* (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). The State ceded all jurisdiction that it could except for the service

allowing the federal government to obtain exclusive jurisdiction over subject lands.

of process. *See State v. Smith,* 400 S.E.2d at 409.

■ Even if this court were to proceed beyond the plain meaning of the statute and into defendants' statutory construction arguments, defendants could not prevail. The three interpretive canons invoked by defendants all relate here to general catch-all phrases following the specific enumeration in § 104–7. The canons *ejusdem generis* and *noscitur a sociis* provide the guidance that "general words [in a statutory enumeration] are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Keffeler,* 537 U.S. at 384, 123 S.Ct. 1017; *see also Madison v. Virginia,* 474 F.3d 118, 133 (4th Cir.2006) (applying the canons *ejusdem generis* and *noscitur a sociis* ). The canon *expressio unius* suggests that the expression of one item of a commonly associated group or series excludes others left unmentioned. *United States v. Vonn,* 535 U.S. 55, 65, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002); *see also Ayes v. U.S. Dept. of Veterans Affairs,* 473 F.3d 104, 110–11 (4th Cir.2006) (applying *expressio unius* ); *In re Hudson,* 165 N.C.App. 894, 600 S.E.2d 25, 27–28 (N.C.App.2004) (same).

■ Here we have a statutory enumeration followed by two broad catch-all phrases. The canons cited by defendants might be helpful in guiding this court's interpretation of the phrase "other public buildings whatever" and might even steer the court away from reading that phrase as expansively as the Supreme Court has the phrase "needful buildings" in the Enclave Clause.[9] *See, e.g., United Seniors Ass'n, Inc. v. Social Sec. Admin.,* 423 F.3d 397, 402 (4th Cir.2005). But the inclusion of the second catch-all phrase obviates the need for such an analysis. A statute must be construed so as "to give effect to every part of it, it being presumed that the Legislature did not intend any of its provisions to be surplusage." *State v. Williams,* 286 N.C. 422, 212 S.E.2d 113, 119 (N.C.1975). Defendants' use of the interpretive canons would render the second catch-all phrase a nullity. Likely recognizing this, defendants suggest the phrase "or for any other purposes of the government" should be read as an explanatory limitation on the rest of the statute. This court finds no authority for such a reading. The statute as a whole is more appropriately construed as urged by plaintiff and suggested by *State v. Smith.* Unlike in many of the cases cited by defendants, isolating the second catch-all phrase in § 104–7 does not cause the statute to encompass any more than its context suggests the legislature intended. *See Andrews v. United States,* 441 F.3d 220, 223–24 (4th Cir.2006), and cases cited therein.

For the reasons stated, the court rejects defendants' arguments on this issue and finds that the North Carolina General Assembly consented to the acquisition of the Marine Corps Lands for the purposes for which they were later acquired, through passage of § 104–7, in full compliance with the Enclave Clause.

### 2. Acceptance By the Federal Government

The assent of the United States is required to make a transfer of exclusive jurisdiction complete. 40 U.S.C. § 255 (1940). Assent is not automatic but can be effected by the head of the department having control over the lands through the filing of a notice of acceptance with the Governor of the ceding state. *Id.*

■ Defendants challenge the federal government's purported acceptance of ju-

---

9. As a practical matter, however, the court would still not be inclined to read § 104–7 more narrowly than the North Carolina Supreme Court did in *State v. Smith.*

risdiction over the land at MCAS Cherry Point, pointing to the absence of a counter-signed copy of a letter allegedly sent by Secretary Forrestal to Governor Broughton accepting jurisdiction as evidence that the letter was never sent, But such a letter is merely one form of evidence of acceptance. Plaintiff also submitted a document entitled "Summary of activities, method of acquisition, areas and jurisdiction," from the records of Governor J. Melville Broughton, Agencies, Commissions, Departments, and Institutions, 1941–1944, Navy Department, Box 59. (Pl.'s Mem. Supp. Summ. J. Ex. 1.) This document lists a 7582.2 acre portion of MCAS Cherry Point acquired by condemnation on September 26, 1941 (the same date the United States filed its Petition for Condemnation and Declaration of Taking as to the MCAS Cherry Point land). A handwritten notation indicates a "jurisdiction date" for this property of December 16, 1941, the same date plaintiff claims the sixth letter was sent by Secretary Forrestal to Governor Broughton. The lands at issue are also listed in the U.S. General Services Administration's most recent listing of federally-owned property in North Carolina. (Pl.'s Mem. Supp. Summ. J. Ex. 9.) Under these circumstances, there is no genuine issue of material fact left for trial, and the court finds that plaintiff's evidence of record, combined with the absence of any counter-vailing evidence submitted by defendants, is sufficient to warrant summary judgment on this issue.[10]

B. *The United States Has Not Lost Exclusive Jurisdiction Over the Marine Corps Lands*

Federal jurisdiction, once properly obtained, does not necessarily persist in perpetuity. The federal government may surrender jurisdiction over state lands back to the state through a process known as "retrocession" or "recession," by action of the secretary of a military department, *see* 10 U.S.C. § 2683, or by some other method of Congressional authorization, *see, e.g.*, Act of July 28, 1964, Pub.L. 88–384, 78 Stat. 336. Federal jurisdiction also terminates when the federal government transfers subject state lands, without substantial restriction, to private entities. *See Baltimore Shipbuilding & Dry Dock Co. v. Baltimore*, 195 U.S. 375, 25 S.Ct. 50, 49 L.Ed. 242 (1904); *S.R.A.*, 327 U.S. at 563–65, 66 S.Ct. 749. In addition,

> ... [Exclusive federal jurisdiction] is necessarily temporary, to be exercised only so long as the places continue to be used for the public purposes for which the property was acquired or reserved from sale. When they cease to be thus used, the jurisdiction reverts to the State.

*Fort Leavenworth*, 114 U.S. at 542, 5 S.Ct. 995. Even in cases of less-than-complete or restricted transfer, federal jurisdiction may be lost if the United States strays beyond the terms of a state's original consent and cession. "When ... a state cedes jurisdiction to the United States, the state may impose conditions which are not inconsistent with the carrying out of the purpose of the acquisition.... The terms of the cession, to the extent that they may lawfully be prescribed, determine the extent of the Federal jurisdiction." *United States v. Unzeuta*, 281 U.S. 138, 142, 50 S.Ct. 284, 74 L.Ed. 761 (1930) (internal

10. At the evidentiary hearing, the parties agreed that the record then contained all evidence relevant to a decision on this issue. Therefore, as an alternative to granting summary judgment, the court finds as a fact that Secretary Forrestal sent a letter to Governor Broughton accepting jurisdiction over the land at issue at MCAS Cherry Point, and that Governor Broughton received the letter.

citations omitted).[11]

■ The question presented here is whether a public/private partnership of the type entered into by Actus and the federal government brings about a relinquishment of exclusive federal jurisdiction. This precise issue has not, to this court's knowledge, been confronted in the federal courts before today.

Defendants argue that the Project triggered a springing reversion clause in § 104–7, causing the tax-exemption previously enjoyed by the federal government to lapse.

> So long as the said lands shall remain the property of the United States when acquired as foresaid, *and no longer*, the same shall be and continue exempt and exonerated from all State, county, and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State.

§ 104–7 (emphasis added). The 50–year Ground Lease and Conveyance Agreement was, defendants argue, the equivalent of a sale, transferring equitable title to the plaintiff and making the Marine Corps Lands no longer the "property" of the United States, thereby rendering the Lands and the real and personal property thereon subject to local taxation.[12]

There are two relevant lines of inquiry suggested by the case law: one focused on *purpose;* the other on *ownership* or *control.* Both are reflected in conditions typically found in consent and cession statutes. For example, in *Palmer v. Barrett,* 162 U.S. 399, 403, 16 S.Ct. 837, 40 L.Ed. 1015 (1896), jurisdiction was ceded "for the uses

and purposes of a navy yard and naval hospital," and the statute expressly provided "that the United States may retain such use and jurisdiction as long as the premises described shall be used for the purposes for which jurisdiction is ceded, and no longer." (internal quotation marks omitted.) With such a condition in place, a lease granted on a portion of the subject land to the City of Brooklyn "for market purposes" was held to terminate the federal government's exclusive jurisdiction over the leased land, at least during the term of the lease. *Id.* at 403–04, 16 S.Ct. 837.

Cases like *Palmer* have no application here, where the reverter clause in the statute is not concerned with the purposes for which the property is maintained but with ownership. Moreover, this is not a case otherwise demanding a "purpose" inquiry—there is no question that the Marine Corps Lands are still being used for the purpose for which they were originally accepted; that is, as marine corps training areas. To the extent defendants may be arguing that the Project holds for plaintiff a proprietary purpose to be contrasted with the military purpose for which the federal government accepted jurisdiction, this court finds such an argument foreclosed by cases recognizing that it is the overall purpose of the Enclave, and not the interests of a private party in its isolated or temporary operations on a portion of the Enclave, that controls. *See Benson v. United States,* 146 U.S. 325, 331, 13 S.Ct. 60, 36 L.Ed. 991 (1892); *Arlington Hotel Company v. Fant,* 278 U.S. 439, 454, 49 S.Ct. 227, 73 L.Ed. 447 (1929); *Unzeuta,*

---

11. Congress may also authorize or permit certain state actions, including the use of the state's taxing authority, in areas of exclusive federal jurisdiction. This is the teaching of *Offutt Housing Co. v. County of Sarpy,* 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151 (1956), but has no application where, as here, Congress has actively withheld its consent to

state property taxation, 10 U.S.C. § 2878(d)(1).

12. Defendants recognize their inability to tax the United States' remaining interest in the Lands and property, and they are not seeking to collect any such tax.

281 U.S. at 138, 50 S.Ct. 284; *Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 372–73, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964).

The reversion clause in § 104–7 speaks directly and forcefully to the issue of ownership ("So long as the said lands shall remain the property of the United States . . . and no longer . . . ."). Therefore cases construing similar statutes, and those dealing with the importance of ownership in the absence of a reversion clause, should be given the greatest weight in the present analysis.

In *Baltimore Shipbuilding & Dry Dock Co. v. Baltimore,* 195 U.S. 375, 25 S.Ct. 50, 49 L.Ed. 242 (1904), the United States conveyed land to a private dock company with the conditions that the company construct and maintain a dry dock on the land and grant the United States free use of the dock. Failure to comply with the conditions would cause the land, with all its privileges and appurtenances, to revert to the government. The Court found it significant that it was "only by forfeiture that the rights of the United States [could] be enforced against the *res,*" *id.* at 382, 25 S.Ct. 50, and held the dock company's fee taxable by the state.

Defendants also rely on *S.R.A., Inc. v. Minnesota,* 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851 (1946). In *S.R.A.,* the United States had maintained exclusive jurisdiction over a building used as a post office, customhouse, and offices for federal departments and agencies. The government then sold the building to a private party under an installment sales contract. Fee simple title remained in the United States, which also retained a right of repossession in case of nonpayment. The Court held that under such an arrangement the federal government was "in the position of a mortgagee," finding that the transfer terminated the federal government's exclusive jurisdiction over the property. 327

U.S. at 565, 66 S.Ct. 749. The Court suggested that "the sovereignty of the United States [ended] with the reason for its existence and the disposition of the property," *Id.* at 564, 66 S.Ct. 749, making both purpose *and* ownership appear central to its reasoning.

But the Court later clarified that ownership is but one part of a broader inquiry into whether the federal government retains "primary jurisdiction and control" over the land. *Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 372–73, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964). In *Humble Pipe Line,* the United States leased a portion of an Air Force base to a private company for construction of an oil pipeline, along with the right to exploit parts of the land for oil and gas. The Court distinguished *S.R.A.* on the basis that the United States had *sold* the land in that case to a private party to be used for nongovernmental purposes, in contrast to the lease of lands remaining under the federal government's control in *Humble Pipe Line. Id.* "There is no evidence here which would justify a court in deciding that the Government does not need to keep all of this tract intact, ready for use when needed for the highly important military purposes to which it has been dedicated." *Id.* at 373, 84 S.Ct. 857.

The case at bar is not *Baltimore Shipbuilding, S.R.A.,* or *Humble Pipe Line* redux, but it bears by far the greatest likeness to *Humble Pipe Line.* The government here retains fee title to the land, unlike in *Baltimore Shipbuilding.* To be sure, the federal government does not have possession or day-to-day control of the land under the Project terms; plaintiff does. This makes the instant case somewhat like *S.R.A.,* where the United States retained legal title and a security interest in the property but little more.

But the level of control retained by the United States under the Project satisfies the court that the government still holds the lands subject to its "primary jurisdiction and control" as that phrase was used in *Humble Pipe Line*. Under the terms of the Ground Lease, the United States will be the sole owner of the land and the improvements at the end of the lease term. Plaintiff is limited in its use of the subject lands to activities spelled out in the Ground Lease. Plaintiff has significant obligations pursuant to the Project, and the government has corresponding rights of termination and repossession in the event plaintiff's performance proves unsatisfactory. Combined with these important "control" factors, both the Marine Corps Lands as a whole and the specific properties to be managed by plaintiff continue to be used for military purposes attendant to the original cession of jurisdiction and acceptance by the United States. There is no indication that the government's operation of MCAS New River, MCB Camp Lejeune, or MCAS Cherry Point will change in any significant respect in the wake of its agreement to join in the Project with Actus.

Additionally, defendants attempt to imbue with significance plaintiff's agreement to "assume that full property taxes and/or possessory taxes will be assessed" on its property under the Project. (Def.'s Mem. Supp. Summ. J. Ex. 1 at 22–23.) The court finds nothing more in this bid solicitation language than "a precaution on the Government's part to guard itself against liability for payment of any state taxes 'lawfully assessed' against its lessee." *Humble Pipe Line*, 376 U.S. at 374, 84 S.Ct. 857. Defendants also deem it of note that plaintiff might, under certain circumstances, rent housing units to non-military personnel. If the government one day sections off a portion of the subject Lands and effectively severs it from the military installations, and plaintiff then puts the properties to non-military uses, that will be a different case from the one before the court today. As it stands, however, the remote possibility that some on-base housing units might be allocated to non-military personnel does nothing to cause this court to question the decision it reaches today.

The court finds that the Project did not trigger the springing reversion clause in § 104–7, that the Marine Corps Lands presently remain the property of the United States, and that the government holds the Lands subject to its primary jurisdiction and control. As such, the Lands and all real and personal property located thereon, *see Surplus Trading Co.*, 281 U.S. at 657, 50 S.Ct. 455, remain beyond the taxing authority of the defendant counties.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment [DE # 28] is GRANTED, and defendants' motion for summary judgment [DE # 31] is DENIED. Accordingly, the court hereby ORDERS, ADJUDGES, AND DECREES as follows:

1. The subject areas of MCAS New River, MCB Camp Lejeune, and MCAS Cherry Point are under the exclusive federal jurisdiction of the United States government, pursuant to Article I, Section 8, Clause 17 of the United States Constitution;

2. Except where expressly authorized by federal statute, defendants do not have lawful authority to enforce state laws, excepting service of civil and criminal process, on the Marine Corps Lands;

3. The Military Housing Privatization Initiative, 10 U.S.C. § 2871, *et seq.* ("Alternative Authority for Acquisition and Improvement of Military Housing") does not grant any power or authority to On-

slow or Craven County to enforce property tax laws on the Marine Corps Lands;

4. All real and personal property related to plaintiff's management, construction and renovation of privatized military base housing pursuant to the Military Housing Privatization Initiative, 10 U.S.C. § 2871, *et seq.* ("Alternative Authority for Acquisition and Improvement of Military Housing"), is not subject to property taxation by Onslow or Craven County.

5. Defendants are prohibited from listing, appraising, assessing, or taxing any real or personal property related to plaintiff's construction and renovation of military base housing pursuant to the Military Housing Privatization Initiative, 10 U.S.C. § 2871, *et seq.* ("Alternative Authority for Acquisition and Improvement of Military Housing"), on the Marine Corps Properties.

Defendants' counterclaims are DISMISSED. Each party shall bear its own costs. The clerk is directed to close the case.